**INTERNATIONAL LONGSHOREMEN'S & WAREHOUSEMEN'S UNION, LOCAL 21, Plaintiff-Appellee,**

v.

**REYNOLDS METALS COMPANY, Defendant-Appellant.**

**No. 71-1781.**

United States Court of Appeals, Ninth Circuit.

Nov. 9, 1973.

Allan Hart (argued) of Lindsay, Nahstoll, Hart, Duncan, Dafoe & Krause, Portland, Or., for defendant-appellant.

Raymond J. Conboy (argued), of Pozzi, Wilson & Atchison, Portland, Or., for plaintiff-appellee.

Before CHAMBERS and TRASK, Circuit Judges, and CONTI,* District Judge.

CONTI, District Judge:

This is a suit by labor union under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a) to enforce an alleged contract between plaintiff Union Local 21 and defendant Reynolds Metals Company.

At the oral argument before this court, counsel for appellant Reynolds Metals Company made a suggestion that the appeal was moot. This suggestion was based upon the fact that the Memorandum of Understanding between Reynolds Metals Company (appellant) and I.L.W.U., Local 21 (appellee), dated November 25, 1966, upon which this lawsuit is based, was incorporated into the Working Agreement between the Port of Longview and the I.L.W.U., Local 21.

That latter Working Agreement expired by its terms on July 1, 1971. The District Court entered a stay pending appeal, and the Working Agreement, incorporating the Memorandum of Understanding, expired on July 1, 1971. The automatic renewal provision contained in the Working Agreement does not have any force and effect pending this appeal because by its terms it was not applicable. That provision states:

> "Section VIII. This agreement shall become effective this 6th day of June, 1967, and shall terminate on July 1, 1971, and shall be subject to reviews as set forth in the Pacific Coast Longshoremen's and Clerks' Agreements. *This agreement shall be considered renewed from year to year thereafter unless either party shall have given written notice of its desire to modify or terminate this agreement at least sixty days prior to expiration date . . .*" (Emphasis added)

Appellee itself argues that it gave such timely notice of its desire to modify the agreement.

Therefore, because of the expiration of the Memorandum of Understanding and the Working Agreement on July 1, 1971, the case has become moot.

Although this court has held for appellant Reynolds on the issue of mootness, it is also the opinion of this court that appellant should also prevail on the merits of the appeal for the reasons contained in the remainder of this opinion.

The factual background of this dispute is that Reynolds Metals ("The Company") has an aluminum reduction plant at Longview, Washington. The plant converts a powder like substance called alumina into aluminum ingots.

Since 1963 the unloading of alumina was covered by a contract between the Port of Longview (the "Port") and plaintiff Longshoremen's Local 21 (the "Union"). The Company had an agreement with the Port under which the Port performed all longshoremen's work on a cost plus basis. This work was

---

* Honorable Samuel Conti, United States District Judge, Northern District of California, sitting by designation.

performed at the Port of Longview's dock (the "Port Dock").

In 1965 the Company was considering building its own dock to handle more alumina. (Hereinafter the "Company Dock"). This Company Dock would only handle "self-unloading" vessels. The Port Dock handled mostly "crane-unloading" vessels and a few "self-unloading" ones.

In 1966 the Company was dissatisfied with the longshoremen's performance at the Port Dock and negotiations were entered into with the Union in which certain changes were discussed. In particular, these changes involved work hours for the various shifts and the establishing of a pool of crane operators.

On October 31, 1966, an "Understanding" was reached. Both sides agree that this understanding did not purport to cover the issue of who would do the longshoremen's work at the proposed Company Dock. The Union had sought to inject this issue into the negotiations but the Company had refused to discuss it. The Union membership refused to ratify this agreement because it did not cover the issue of the work at the proposed Company Dock.

Subsequent negotiations in November 1966 smoothed out some issues in regard to working hours. In addition, a "T-Manning" provision was included. This type of provision gives the Company the right to immediately put in a new system of manning if new procedures are utilized, subject to grievance procedures by the Union. That "T-Manning" provision provided:

"C. *Manning Scales*

1. *Crane Type Vessels*

One Hatch Boss for overall operations.

Two Crane Operators per unit, who shall relieve each other. (The operator on relief shall act as hatch tender when necessary.)

Four Swing Men, two of whom may be used as shovelers.

Bulldozer or payleader operators, two per machine and shovelers may be added to the appropriate shift as needed.

2. *Self Unloading Type Vessels* (Subject to the 'T' Manning provisions as set forth in the M & M Sections 10.3(b), 10.4 and 15.2 of the Pacific Coast Longshore Agreement.)

One Hatch Boss for overall operations.

Five swingmen.

Basic longshoremen may be added as needed at the employer's discretion."

This "Memorandum of Understanding" was signed by the Union and the Company on November 25, 1966, and was later included verbatim in 1967 in the four-year Working Agreement between the Port and the Union.

In June of 1967 the Company's engineers completed a study re the feasibility of the proposed Company Dock as compared to further development at the Port of Longview (the "Port Dock"). It was decided to build a new dock and work was started in October, 1967. Fire delayed construction and the dock started to operate in September, 1969. In the interim the Company planned to assign work at the dock to the Aluminum Workers International Union, Local 305. The ships' crews did the dockside portion. The ships are all "self-loading". "Crane unloading" ships still unload at the Port Dock where the plaintiff Union does the longshore work.

The Union complained in 1969 that the Memorandum of Understanding of November 25, 1966, controlled the work and assigned it to Local 21. The Company denied this, and the Union brought suit.

The trial court held that a contract existed under Section 301(a) and held for the Union on the interpretation of that contract. In particular the court held that the Memorandum of Understanding entered into on November 25,

1966, was a collective bargaining agreement. It further held that the agreement granted to the Union exclusive jurisdiction of loading and discharging aluminum ore vessels at the Port of Longview, including those that load at the dock facility constructed by the defendant Company adjacent to its Longview Aluminum reduction plant.

The Company appealed, arguing that the November 25, 1966 agreement is not a collective bargaining agreement, and, in any case, that it did not provide for exclusive jurisdiction by the Union over the loading at the proposed Company dock.

 It is the opinion of this court that there is no mention of the provision re the Company Dock work assignment in the contract at all. All provisions of the Memorandum of November 25, 1966, related to the Port Dock.

The Union argued in the trial (and on appeal) that the "T-Manning" provision discussed above could only be applicable to the proposed Company Dock with its self-loading capabilities because it was the only dock capable of handling a "new method of operation" as contemplated by the T-Manning provision. Thus, the Memorandum applied to the proposed Company Dock. (However, the Union conceded on cross-examination that the Port's facilities might be reconstructed to admit "self-loading" ships.) (Tr. p. 72–73) The Company, of course, argued that the T-Manning procedures could be used if the new dock was not built and the old dock was modernized to handle "self-loaders".

In addition, the Company argues that even if the Memorandum were construed to include the proposed Company Dock, it contained no promise of employing Local Union 21 to exclusively handle the longshoremen's work. A study of the Memorandum itself supports this argument.

In addition, the history of negotiations leading up to the Memorandum shows no intent to grant exclusive jurisdiction over the work to the Union.

The Company adamantly refused to discuss this issue up to the time of the October 31, 1966, agreement. The Union only insisted that wage and manning provisions (which were already in existence) be inserted to make the Memorandum look like a collective bargaining agreement. A new dock, or jurisdiction over work at the new dock, was not mentioned. Company officials had no intent or authority to include such an issue in the Memorandum. The Company never agreed to this issue. In fact, the Union representative, Mr. Van Brunt, testified that the issue was never covered in plain language "because we were not able, at the time of discussion, to get the company to agree to put it in that manner". (Tr. p. 77) In summary, there is no creditable explanation in the record of how the Company's previously adamant stand was changed.

With regard to the Findings made by the District Court, they were clearly erroneous. One cannot look at the Memorandum and hold that the parties actually agreed that the work at the proposed Company Dock would be carried out by Local 21. F.R.Civ.P. 52(a).

Therefore, even if the case had not been rendered moot, this court must find for appellant on the merits and order that the decision of the District Court be reversed.